IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Lia C. Heidel (nee Black), : | |
| : | Case No. 1:12-cv-298 |
| Plaintiff, : | |
| : | Chief Judge Susan J. Dlott |
| v. : | |
| : | Order Denying Defendant's Motion for |
| Ohio Department of Public Safety—Ohio : | Summary Judgment |
| State Highway Patrol, : | |
| : | |
| Defendant. : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 28). Plaintiff Lia C. Heidel (nee Black) brings this gender discrimination case against her former employer, Defendant Ohio Department of Public Safety—Ohio State Highway Patrol ("Highway Patrol" or "OSHP").  For the reasons that follow, the Court will **DENY** the Motion for Summary Judgment.

I. BACKGROUND

A. Factual Background

The following statement of facts is derived, except where otherwise noted, from Defendant's Proposed Undisputed Facts (Doc. 28-1) and Plaintiff's Response thereto (Doc. 38-2).

Heidel graduated from the Highway Patrol on September 1, 2000.  She undertook field training in Lancaster, Ohio, then was assigned to the Statehouse at the rank of trooper.  In June or July 2001, following her request for a transfer, Heidel was assigned to the Georgetown Patrol Post at the rank of trooper.  Heidel remained in the position and rank of trooper at the Georgetown Patrol Post until the end of her career in October 9, 2009.

1

On July 11, 2009, Heidel was leaving her home in Mt. Orab, Ohio around 2:10 p.m. or 2:15 p.m. She entered her patrol car and drove down the driveway to the gate to her residence. She heard a vehicle accelerating on the road when she exited her patrol car to open the gate. Heidel re-entered her patrol car, then saw a vehicle driving on Pleasantville Road which she visually estimated to be travelling about 65 to 70 miles per hour. Heidel had been trained at the Highway Patrol academy to visually estimate speed. (Heidel Dep., Doc. 14 at 68.)[1] The unposted speed limit for Pleasantville Road is 55 miles per hour. Heidel pursued the vehicle in her patrol car and pulled it over at the intersection of Pleasant Hill Road and Grant Lake Road near her home.

Heidel requested the driver of the vehicle, Christopher Greene, to produce his license and registration. Heidel questioned Greene about the speed at which he was traveling and Greene responded that he was travelling at 62 or 63 miles per hour. Greene told her that his car was overheating and that he wanted to get it up to a certain speed before he turned the engine off. Heidel responded that Greene's stated reason was not a good excuse to speed. (*Id.* at 66.) Heidel informed Greene that she had visually estimated his speed to be 65 miles per hour. She told him that she was going to issue him a citation. Heidel returned to her car and checked Greene's driving record. He had other moving violations and a pending driver's license suspension through the Highland County Court for not showing proof of insurance on a previous ticket. (*Id.* at 33–34.) Greene's driving record was an indication to Heidel that he would not reduce his driving speed. (*Id.* at 111.)

Heidel issued Greene a traffic citation. Heidel wrote on the citation that Greene had been travelling 62 miles per hour and she checked a box which indicated that she had used a stationary

---

[1] The page numbers listed in citations to documents filed electronically in the CM/ECF docketing system refer to the "PAGEID #" generated by the system.

radar to gauge Greene's speed. She also wrote on the citation the radar number and the time of her radar calibration check. In fact, Heidel had not used the radar, but had determined Greene's speed using visual estimation and Greene's admission. Additionally, Heidel checked a box on the citation form which stated "Personal Appearance Required." Finally, Heidel signed the citation below the affirmation which stated, "The issuing/charging law enforcement officer states under the penalties of perjury and falsification that he/she has read the above complaint and that it is true." (Doc. 14-1 at 207.)

Heidel had issued warnings to between 50 and 100 motorists based on visual speed estimations of speed, but she had never before issued a citation based on a visual estimation. (Heidel Dep., Doc. 14 at 79–80.) Heidel knew that it was against Highway Patrol policy to issue citations based upon visual speed estimation. Heidel also knew that it was against policy to issue a traffic citation based upon a driver's admission of his or her speed. Heidel issued the citation instead of a warning because she believed that a warning would not cause Greene to slow down or to change his driving habits. Later that day, Heidel returned to the Georgetown Patrol Post and placed the citation in a bin designated for citations to be filed in court.

Heidel points out that multiple Highway Patrol troopers testified that they had discretion whether to issue a traffic citation. (*Id.* at 111; Utter Dep., Doc. 37 at 1562; Johnson Dep., Doc. 24 at 1086, 1100.) Troopers also used discretion to lower the speed level written on a citation to prevent more severe penalties. (Rhodes Dep., Doc. 20 at 832.)

Greene contacted the Georgetown Patrol Post the day of his traffic stop to make a complaint against Heidel. Sgt. Shannon Utter spoke to Greene. Greene told Sgt. Utter that Trooper Heidel had issued for a citation against him based on visual estimation and without using a radar. Sgt. Utter told Greene that his traffic stop would be investigated and that a

supervisor would contact him at a later time. Sgt. Utter retrieved the citation before it was filed in the Brown County Municipal Court.

As part of the investigation, Sgt. Robert Hayslip and Lt. Brian Rhodes both watched video of the traffic stop taken by the patrol car's recording device. (Hayslip Dep., Doc. 21 at 925; Rhodes Dep., Doc. 20 at 824.) Lt. Rhodes then contacted the District Commander, Captain Robert Johnson, who concurred with the decision to investigate Greene's allegations. Lt. Rhodes assigned Sgt. Hayslip to conduct the investigation. Sgt. Hayslip interviewed Greene as part of his investigation. Greene accused Heidel of acting in an unprofessional manner. He recounted the facts about his traffic stop and citation. He also stated that Heidel accused him of being the driver about whom her neighbors had previously complained for speeding.

Sgt. Hayslip also conducted a recorded interview with Heidel, during which a union representative for Heidel was present. Heidel admitted during the interview that she had visually determined Greene's speed to be 65 miles per hour and that she had not used a radar. She also admitted that she did not have proof that Greene was the driver of the vehicle about whom her neighbors had previously accused of speeding. Heidel told Sgt. Hayslip that she believed that she had behaved in a professional manner and that Greene also had been polite to her.

Lt. Rhodes also interviewed Heidel. Heidel again admitted the facts surrounding the citation. Lt. Rhodes asked Heidel if the traffic stop had been an attitude stop and arrest of a violator and she stated that it had been. Heidel described an attitude stop at her deposition as when "the person that you have stopped basically talks themself in to a ticket based upon their attitude, their demeanor." (Heidel Dep., Doc. 14 at 115.)

Sgt. Hayslip drafted an Administrative Investigation Report ("AI Report") and submitted it to Lt. Rhodes on or about August 10, 2009. Sgt. Hayslip concluded that Heidel had been

4

unprofessional towards Greene, had issued a citation based solely on an estimated speed of the vehicle, and had indicated on the citation that she had used stationary radar to check Mr. Greene's speed when she had not used radar. On or about August 14, 2009, Lt. Rhodes forwarded the AI Report to Cpt. Johnson and recommended a finding of "Chargeable." Lt. Rhodes did not make a recommendation as to discipline. On or about August 21, 2009, Cpt. Johnson concurred with the findings in the AI Report. He also made no recommendation as to discipline. Cpt. Johnson forwarded the report to Staff Lt. Marla Gaskill who commanded the Investigation Unit in the Human Resources Management Department of the OSHP located in Columbus, Ohio. Staff Lt. Gaskill concurred in the findings.

Staff Lt. Gaskill forwarded the AI Report to the Office of Training, Selection, and Standards. The Office of Training, Selection, and Standards is located in Columbus, Ohio, and has responsibilities for the entire State of Ohio. The Office of Training, Selection, and Standards reviews Administrative Investigations to start the review process for discipline and to recommend a level of discipline to attempt to ensure consistency as to discipline and to avoid disparate treatment. Lieutenant Charles Linek was in charge of the Labor Relations Unit within the Department of Training, Selection, and Standards. He began to review the AI Report in August 2009.

Lt. Linek concluded that Trooper Heidel had not used radar to check Greene's speed despite the citation notation that she had used radar. Lt. Linek determined that Heidel had falsified the citation she issued to Greene. He recommended termination to his supervisors in the Office of Training, Selection, and Standards. The termination recommendation was approved again during three further steps up in the review process before reaching the Office of the Director of the Ohio Department of Public Safety in September 2009.

5

On or about September 28, 2009, Heidel was given a letter giving her notice that the Director of Public Safety Cathy Collins-Taylor intended to terminate her from her employment with the Ohio State Highway Patrol for violation of Rule 4501:2-6-02(E)[2] and Rule 4501:2-6-02(Y)(2).[3]  A pre-discipline meeting on the matter was held on October 5, 2009 following notice to Heidel and just cause for the determination was found.  On October 9, 2009, after the meeting, Director Collins-Taylor signed a letter terminating Heidel's employment for "violation of the Ohio State Highway Patrol Rules and Regulations 4501:2-6-02 (E) False Statement, Truthfulness and 4501:2-6-01 (Y)(2), Compliance to Orders."  (Doc. 22-1 at 999.)

Heidel grieved her termination and submitted to an arbitration.  The arbitrator upheld her termination and denied the grievance.

**B.    Procedural Background**

On April 13, 2012, Heidel filed a Complaint (Doc. 1) to initiate this action.  She asserts claims against the Highway Patrol for gender discrimination in violation of Title VII and Ohio Revised Code Chapter 4112.  The Highway Patrol now has moved for summary judgment as to

---

[2]  Rule 4501:2-6-02(E) states as follows:

> (E) False statement, truthfulness
> (1) A member shall not make any false statement, verbal or written, or false claims concerning his/her conduct or the conduct of others.
> (2) A member shall not, in any manner, cheat on, or tamper with, an examination, test, or measurement. A member shall not, nor attempt to, obtain, furnish, or accept answers or questions to examinations.
> (3) A member shall not feign illness or injury, falsely report illness or injury, or otherwise deceive, or attempt to deceive, any official of the division as to the condition of his/her health.

Ohio Admin. Code § 4501:2-6-02(E).

[3] Rule 4501:2-06-02(Y)(2) states as follows:

> (Y) Compliance to orders
> * * * *
> (2) A member shall conform with, and abide by, all rules, regulations, orders and directives established by the superintendent for the operation and administration of the division.

Ohio Admin. Code § 4501:2-06-02(Y)(2).

both claims. Heidel responds that material disputed facts preclude resolution of her claims at summary judgment. The matter is fully briefed and ripe for adjudication.

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**III.  ANALYSIS**

Title VII makes it unlawful for an employer to discharge an individual or to otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's gender. 42 U.S.C. § 2000e–2(a)(1). Ohio Revised Code Chapter 4112, likewise, makes it unlawful for an employer to discriminate against an employee with respect to terms and conditions of employment based on gender. Ohio Rev. Code § 4112.02(A).

An employee may base her claim of employment discrimination on a theory of disparate impact or disparate treatment or both. *Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987); *West v. Fifth Third Corp.*, No. 1:11cv547, 2013 WL 3387815, at *5 (S.D. Ohio July 8, 2013). Plaintiff Heidel is pursuing her claim under the disparate treatment theory. She must show that the Highway Patrol treated her less favorably than other troopers because of her gender. Proof of discriminatory motive is critical. *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92 (6th Cir. 1982); *West*, 2013 WL 3387815, at *5.

Disparate treatment claims are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). The *McDonnell Douglas* burden-shifting analysis requires the plaintiff first to establish a prima facie case of discrimination. *Policastro*, 297 F.3d at 538. Heidel seeks to prove her claim with circumstantial evidence. "Circumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does allow a fact-finder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (citation omitted). Heidel can establish a prima facie case of sex discrimination

8

through circumstantial evidence by showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position lost; and (4) she was treated less favorably than a similarly situated non-protected person. *Mitchell*, 964 F.2d at 582; *see Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). The Highway Patrol is entitled to summary judgment if Heidel does not establish a prima facie case. If Heidel establishes a prima facie case, the Highway Patrol can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Battle v. Haywood Cty. Bd. of Educ.*, 488 F. App'x 981, 985–86 (6th Cir. 2012).

Once the Highway Patrol states a legitimate, nondiscriminatory reason, Heidel must prove that the stated reasons were not the true reasons for her termination, but were a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Battle*, 488 F. App'x at 986. To establish pretext, Heidel must demonstrate that the stated reasons (1) had no basis in fact, (2) did not actually motivate the decision, or (3) was insufficient to motivate the decision. *Battle*, 488 F. App'x at 986; *Manzer v. Diamond Shamrock Chems., Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has cautioned that courts should "avoid formalism" in the application of this test, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400, n. 4 (6th Cir. 2009). Pretext, the court observed, "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" The pretext inquiry "requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* The pretext test can be distilled to one simple requirement: Heidel must produce sufficient evidence such that a reasonable jury could doubt the defendants' stated reasons for its actions. *See id.*

Plaintiff Heidel is proceeding under the disparate treatment theory of discrimination with circumstantial evidence. Regarding the prima facie case, the Highway Patrol does not dispute that Heidel is a member of a protected class, that she was qualified for the position she held, and that she suffered an adverse employment action when she was terminated. The Highway Patrol argues, however, that summary judgment is appropriate because Heidel cannot prove that she was treated less favorably than similarly situated male troopers. The Highway Patrol also has asserted a legitimate non-discriminatory reason for Heidel's termination. Heidel issued a speeding citation against Greene based on her visual estimation of the driver's speed and upon the driver's admission of speeding, both of which were insufficient bases for a citation under OSHP policy. Further, Heidel falsely stated on the citation that she gauged Greene's speed with a radar. The Highway Patrol determined that Heidel violated Rules 4501:2-6-02(E) and 4501:2-6-02(Y)(2).

In this case, Heidel's evidence to prove the fourth prong of her prima facie case and her evidence to prove pretext are the same. Heidel attempts to prove the fourth prong of her prima facie case and that the Highway Patrol's stated reasons for her termination were insufficient to motivate her discharge with evidence that similarly situated male troopers were not fired after engaging in substantially similar misconduct. *Manzer*, 29 F.3d at 1084 (explaining pretext evidence generally; *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 589 (6th Cir. 2002) (explaining how prima facie evidence and pretext evidence can be the same); *Hodges v. City of Milford*, 918 F. Supp. 2d 721, 740 (S.D. Ohio 2013) ("A satisfactory showing that similarly situated employees, who do not belong to the protected class, were treated differently with regard to a work rule can lend support to a plaintiff's pretext argument.") .

10

A. **Similarly Situated Comparators**

In the disciplinary context, ordinarily other employees are considered to be "similarly situated" to the plaintiff only if they "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell*, 964 F.2d at 583). However, courts should make independent determinations in each case to determine the "relevant aspects" of comparison between the plaintiff and the purported similarly situated employees. *Id.* "[P]recise equivalence in culpability between employees" is not required. *Harrison v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 80 F.3d 1107, 1115 (6th Cir. 1996) (citation omitted)), *overruled on other grounds by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 (6th Cir. 1999). The plaintiff must show only that the employees were engaged in misconduct of "comparable seriousness." *Id.* (citation omitted).

1. **Similarly Situated Male Comparators**

Plaintiff Heidel identifies similarly situated male troopers who were subjected to less severe discipline than she by the Highway Patrol. The Highway Patrol's attempts to differentiate, as a matter of law, between Heidel and these purported comparators fail.[4]

a. **Matthew Traywick**

The first purported comparator, Trooper Matthew Traywick, was investigated for issuing seat belt citations to motorists whom he did not witness driving without their seat belts. (Linek Dep., Doc. 15 at 321–26.) A Highway Patrol trooper cannot issue a seat belt citation to a

---

[4] The Court agrees that the purported comparators whose wrongful act neither involved a citation issued to a citizen nor involved a matter of falsification of a record are not similarly situated to Heidel as a matter of law. These would include Donald Edington, Josh Baker, Lonnie Butler, Glendon Ward, and Gary Griffith.

11

motorist the trooper has stopped for speeding unless the trooper observed the seatbelt violation when the vehicle was in motion. (*Id.* at 326.)

Lt. Linek, the officer in charge of the Labor Relations Unit within the Department of Training, Selection, and Standards, who made the initial recommendation that Heidel be terminated, did not recommend that Traywick be terminated. (*Id.* at 327.) In fact, Traywick was not terminated. Lt. Linek testified that Traywick was not disciplined for the issuance of false citations, but rather for not telling the drivers the nature of the citation he was going to issue before issuing the citation. (*Id.* at 323.) Lt. Linek initially stated that Traywick had not been disciplined for issuing false citations because the Highway Patrol did not think that it could prove the false citation allegation. (*Id.* at 323–24.) However, after reviewing Traywick's administrative file, Lt. Linek acknowledged that Traywick had admitted that had not observed each of the seatbelt violations when the vehicles were in motion. (*Id.* at 327.)

The Highway Patrol asserts that Traywick was not similarly situated to Heidel as a matter of law for two reasons. First, it asserts that there is no dispute that Traywick properly pulled over vehicles for speeding, though he may not have had grounds to issue citations on the lesser grounds of seatbelt violations. However, a reasonable jury could conclude that Heidel also had discretion to pull over Christopher Greene and issue a speeding warning based on visual estimation. Also, a reasonable jury could find that the only relevant factor for comparison between Traywick's citations and Heidel's citation was the basis upon which each citation was issued, not the initial bases for the traffic stops. Traywick issued up to twelve citations on false bases, but he was not terminated. Heidel, on the other hand, issued only one citation on a false basis and was terminated.

Second, the Highway Patrol argues that Heidel and Traywick were not similarly situtated because they had different final decisionmakers. Director Collins-Taylor, who made the final decision to terminate Heidel, was not the Director of Public Safety in August 2009 when Traywick was disciplined. (Collins-Taylor Aff., Doc. 28-2 at 1317; Doc. 41 at 1701.)[5] However, the "same supervisor" requirement from *Mitchell*, 964 F.2d at 583, is not strictly enforced in cases where it is not a relevant aspect of comparison under the facts of the case. *See*, *e.g.*, *McMillan v. Castro*, 405 F.3d 405, 414–15 (6th Cir. 2005); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479–80 (6th Cir. 2003). In fact, Collins-Taylor was the Director of the Department of Public Safety for only eight months. This short tenure makes it difficult for Heidel to find a comparator who was disciplined by Collins-Taylor. Moreover, the disciplinary process for the Highway Patrol involves multiple levels of review. Lt. Linek was the first person in the chain of command reviewing the charges against Heidel to make a recommendation as to the appropriate discipline. His recommendation was adopted up several levels without being changed. He recommended the termination of Heidel, but not the termination of Traywick. Further, Heidel and Traywick both admitted to issuing traffic citations on improper grounds. In these circumstances, a reasonable jury could determine that Heidel and Traywick were similarly situated despite the fact that Collins-Taylor was not the final decisionmaker for both.

    **b.**    **Kyle Pohlabel**

Heidel also asserts that Trooper Kyle Pohlabel was similarly situated to her. Pohlabel issued a traffic citation to a motorist for speeding, but told her later during the traffic stop that she could destroy the citation because he did not intend to file it. The Highway Patrol concluded after an internal investigation that Pohlabel violated OSHP Rule 4501:2-6-02(E)(1), a false statement violation. (Linek Dep., Doc. 15 at 334–36; Doc. 15-1 at 418–20.) Director Collins-

---

[5] Defendant does not provide a citation to the record for the fact that Traywick was disciplined in August 2009.

Taylor informed Pohlabel on April 14, 2010 that he would be terminated for his violation, but the termination would be held in abeyance in favor of a last chance agreement. (*Id.*) The Highway Patrol argues that Pohlabel was not similarly situated because he did not seek to prosecute a citizen based on a false statement citation the way Heidel did. However, a reasonable jury could find that Pohlabel was similarly situated in relevant respect because he violated the same OSHP Rule as Heidel.

        **c.**        **Shawn Cunningham, Denny "Jesse" Howard, and Jared Ulinski**

Heidel also compares her situation to that of Steve Cunningham, Denny Howard, and Jared Ulinski, troopers who were investigated but not fired for dishonesty. Cunningham and Howard made false statements by indicating to the computer-aided dispatch system that they were "in service working" while, in fact, they were still at their residences. (Linek Dep., Doc. 15 at 301–02.) Ulinski used a pen to punch holes in his qualification target during a firearms qualification test. (*Id.* at 311–12.) Cunningham, Howard, and Ulinski were issued last-chance agreements as discipline. (*Id.* at 302–03, 311–12.) The Highway Patrol correctly points out that these were internal patrol matters and did not involve the issuance of a citation against a citizen, but a reasonable jury nonetheless could conclude that Cunningham, Howard, and Ulinski were similarly situated since the record indicates that they made false statements on a job record.

        **2.**        **Similarly situated Female Comparators**

The Highway Patrol contends that the foregoing pretext evidence is undercut by evidence that the Highway Patrol also treated other similarly situated female troopers accused misconduct more favorably than Heidel. The Highway Patrol cites to an exhibit entitled "Discipline List/Ohio Highway Patrol" which appears to indicate that three female troopers, Michelle Rayot, Amy Ivy, and Jennifer Bosiacki, were given "last chance agreements" for misconduct

14

characterized as either "Untruthfulness/Dishonesty" and/or "False Reporting/Falsification of Documents." (Doc. 15-1 at 422–25.) The Highway Patrol argues based on this document that that Heidel cannot prove pretext because the Highway Patrol imposed lesser discipline against both male and female troopers than was imposed against to Heidel. Evidence that the Highway Patrol treated both male and female similarly situated troopers better than Heidel would negate an inference of gender discrimination. *See e.g.*, *Ringl v. Ameritech Corp.*, No. 96-1034, 1997 WL 63144, at *3 (6th Cir. Feb. 12, 1997) (stating that plaintiff could not prove that she was denied an invitation to an event based on her gender when other female employees were invited); *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, No. 09-cv-4675, 2012 WL 4483046, at *14–15 (E.D.N.Y. Sept. 27, 2012) ("An inference of gender discrimination is undermined where plaintiff identifies both women and men who receive preferential treatment."); *Anderson v. Producers Rice Mill, Inc.*, No. 5:07CV00205, 2008 WL 2351037, at *4–5 (E.D. Ark. June 4, 2008) (stating that no inference of discrimination arose where both men and women received preferential treatment).

      The Court cannot credit this argument by the Highway Patrol because it cannot accord an evidentiary weight to the Discipline List exhibit. Lt. Linek identified the Discipline List exhibit during his deposition as a report generated by a Highway Patrol system. (Linek Dep., Doc. 15 at 343.) However, Lt. Linek could not state whether he created the report or not. (*Id.*) The Discipline List exhibit has irregularities on its face. The first page of the exhibit states that it is "Page 3 of 5[,]" the second page of the exhibit states that it is "Page 1 of 2[,]" the third page states that it is "Page 1 of 6[,]" and the fourth page states that it is "Page 2 of 6." (Doc. 15-1 at 422–25.) Lt. Linek was not asked to explain what pages are missing, why the pages are missing, or how the missing pages might be relevant.

In addition, Lt. Linek offers no testimony concerning the three female troopers who appear to have been offered last chance agreements.  The Discipline List exhibit standing alone does not offer enough information concerning the misconduct alleged or the disciplined issued to be relied on as evidence at summary judgment.  There is no information concerning the nature of the misconduct which Michelle Rayot is alleged to have performed.  (Doc. 15-1 at 422.)  As to Jennifer Bosiacki, the Discipline List states "Tpr. Bosiacki posted both inappropriate and sexual photographs to her myspace account, bringing discredit to the Division."  (*Id.* at 425.)  There is no explanation given as to how posting inappropriate photographs constitutes "Untruthfulness/Dishonesty."  The information concerning Amy Ivy is similarly deficient.  It states that she "failed to properly perform her duties" by completing crash report(s) "prior to going on time off" and that she failed to properly handle recovered property.  (*Id.* at 423, 425.)  Again, this explanation lacks specific details and does not explain how such behavior constitutes either "Untruthfulness/Dishonesty" or "False Reporting/Falsification of Documents."  (*Id.*)  In sum, the Discipline List exhibit is not sufficient evidence standing alone to establish that the Highway Patrol treated similarly situated females better than it treated Heidel.

### 3.     Conclusion on Prima Facie Case and Pretext

Heidel has presented sufficient evidence that similarly situated male troopers were given preferential treatment to raise an inference of gender discrimination.  A reasonable jury could conclude based on the evidence presented that Heidel can establish a prima facie case of gender discrimination and that the Highway Patrol's articulated reason for her termination was insufficient to justify her termination.  The Highway Patrol, therefore, is not entitled to summary judgment on Heidel's discrimination claims.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Doc. 28) is hereby **DENIED**.

**IT IS SO ORDERED.**

S/Susan J. Dlott_____  
Chief Judge Susan J. Dlott  
United States District Court